UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BOBRICK WASHROOM EQUIPMENT, INC., a California Corporation, | ) ) ) | CV 10-6938 SVW (PLA) |
| Plaintiff, | ) ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | ) ) | |
| AMERICAN SPECIALTIES, INC., a New York Corporation, | ) ) ) | |
| Defendant. | ) ) | |

## I.   INTRODUCTION AND PROCEDURAL HISTORY

On September 17, 2010, Plaintiff Bobrick Equipment, Inc. filed a complaint against Defendant American Specialties, Inc., alleging: (1) trademark infringement under Section 32 of the Lanham Act; (2) unfair competition by false designation of origin under Section 43(a) of the Lanham Act; (3) common law unfair competition; (4) violation of Cal. Bus. & Prof. Code § 17200 *et seq.*; and (5) unjust enrichment.  (Dkt. 1).  On November 5, 2010, Defendant filed a motion to dismiss the complaint, (Dkt. 17), which the Court denied on December 15, 2010, (Dkt. 28).  On April 13, 2011, Plaintiff filed the operative First Amended Complaint ("FAC").  (Dkt. 48).

On August 22, 2011, Defendant filed a Motion for Summary Judgment, in which it argued that Plaintiff's claimed trademark (and related trade dress) is functional, and, therefore, cannot qualify for protection under the Lanham Act or related statutes. (Dkt. 98).  On October 5, 2011, the Court denied the motion, noting that while it believed the factual record before it favored a finding of functionality under the four-factor test applied in the Ninth Circuit, "the Court nevertheless concludes that triable issues of material fact remain with respect to the proper determination and weighing of these factors." (Dkt. 142, at 1).[1]

Court trial commenced on October 25, 2011.  On October 27, 2011, the Court continued the trial pending the completion of further discovery.  Trial resumed on July 17, 2012, and concluded on July 18, 2012.

## II.   FACTUAL BACKGROUND[2]

Both Plaintiff and Defendant manufacture and sell washroom accessories.  In 1993, Plaintiff launched its "Contura" line of washroom products.  Products in the Contura line have a front face that curves along the horizontal axis.  Thus, when viewed from above, the face of the Contura products is in the shape of a convex arc (this design is referred to herein as the "Convex Arc").

In 2003, Plaintiff filed an application with the United States Patent and Trademark Office ("USPTO"), seeking trademark protection for

---

[1] On October 3, 2011, the Court bifurcated Defendant's counterclaim for false patent marking, (Dkt. 52), and deferred ruling on Plaintiff's motion to dismiss this counterclaim, (Dkt. 126), until after the first phase of trial.  (See Dkt. 141).

[2] Additional material facts are developed in further detail *infra* as needed.

1    the Convex Arc design.  On May 17, 2005, Plaintiff was granted U.S.

2    Trademark Reg. No. 2,951,014.

3        The Convex Arc is described in the 2,951,014 registration as

4    follows:

 | The mark consists of the shape of the front face of a washroom product, the front face having a convex "arc" shape as viewed from above.  The height of the front face is exemplary only and can be taller or shorter depending on the product.  The matter shown in broken lines is the portion of the product that is not claimed as part of the mark, which includes any openings, windows, locks or other components in the front face of the washroom product.

16       In 2010, Defendant introduced its "Roval" line of products, which

17   also features products with a curved front face.  Plaintiff claims that

18   these products infringe its registered trademark in the Convex Arc

19   design, as well as the unregistered trade dress associated therewith.

20   In particular, the unregistered trade dress claimed by Plaintiff is

21   comprised of the Convex Arc combined with the following five product

22   features:  (1) cabinets and doors including rounded edges and corners

23   which match one another, and which are curved to complement the Convex

24   Arc; (2) recessed cabinet flanges including rounded edges and corners

25   which are curved to complement the Convex Arc; (3) partially exposed

26   flanges behind the doors; (4) partially exposed flanges behind the

27   waste receptacles; and (5) outward-facing surfaces formed of #4 satin

finish stainless steel (collectively, the "Unregistered Trade Dress").

(See Plaintiff's Supplemental Proposed Findings of Fact, ¶ 17).

**III. SPOLIATION**

Before reaching the merits of this dispute, the Court first will address Plaintiff's request for sanctions in connection with Defendant's discovery-related misconduct and alleged spoliation of relevant evidence.

**A. Background**

On October 14, 2011, Plaintiff filed its Sixth Motion *in Limine*, seeking an Order (1) requiring Defendant to preserve and produce evidence; and (2) for spoliation sanctions in connection with Defendant's failure to institute an appropriate litigation hold notice and its repeated failure to produce relevant emails and other electronic documents requested by Plaintiff. (Dkt. 206). Defendant initially opposed the motion, arguing that it had fully complied with its discovery obligations. (See Dkt. 226). On the third day of trial, however, Defendant's counsel formally withdrew Defendant's Opposition to the motion, stating that he had discovered (the previous evening) that the Opposition contained several inaccurate representations. (See Dkt. 256). At that time, Defendant's counsel conceded that Defendant had failed to produce (or even search for) relevant emails and other electronic documents for numerous key employees.

The Court continued trial, and subsequently appointed Matthew Ghourdjian, CEO of Cogility Software Corporation, as an independent expert pursuant to Federal Rule of Evidence 706. The Court ordered Mr. Ghourdjian to perform an independent search and analysis of Defendant's servers. (Dkt. 259, 260). Mr. Ghourdjian was further ordered to

produce to both parties a copy of any electronic documents containing one or more "keywords" selected by Plaintiff. (Dkt. 260). Pursuant to the Court's Order, Defendant would bear all reasonable costs incurred by Mr. Ghourdjian. (Id.).

On July 10, 2012, Plaintiff filed a Supplemental Brief in support of its Spoliation Motion. (Dkt. 293). Defendant filed an Opposition on July 16, 2012, (Dkt. 303), and the Court heard the motion on July 17, 2012.

**B.    Legal Standard**

"The failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." *Thompson v. U.S. Dep't of Housing & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003). Spoliation is the destruction or material alteration of evidence, or the failure to otherwise preserve evidence, for another's use in litigation. . . .

"A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence[.]"

Surowiec v. Capital Title Agency, Inc., 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011).

A trial court's discretion regarding the form of a spoliation sanction is broad, and can range from minor sanctions, such as the awarding of attorneys' fees, to more serious sanctions, such as dismissal of claims or instructing the jury that it may draw an adverse inference. The court's discretion is not, however, without its limits. Courts must weigh several factors when deciding which type of sanction to impose on a spoliator. Any remedy applied to a spoliator should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been absent the wrongful destruction of evidence by the opposing party. Sanctions under these inherent powers must be exercised with restraint and should be appropriate to the

conduct that triggered the sanction.

Apple Inc. v. Samsung Elecs. Co., Ltd., 2012 U.S. Dist. LEXIS 103958, *15-16 (N.D. Cal. July 24, 2012) (internal citations omitted).  The sanction imposed "must be the least drastic available to adequately mitigate the prejudice" suffered by the opposing party.  Id. at *64.

**C.   Analysis**

**1.   Failure to Produce Documents**

In many respects, Plaintiff's motion for sanctions conflates Plaintiff's *failure to produce* relevant documents in a timely fashion with Plaintiff's alleged *spoliation* of documents.  Defendant's failure to produce documents was both significant and inexcusable.  Despite repeated requests by Plaintiff, Defendant failed to perform even the most basic search of its key custodians' emails and electronic documents.  Nevertheless, through the first two days of trial, Defendant consistently maintained – both to Plaintiff and to this Court – that it had fully complied with all of its discovery obligations.  Only on the third day of trial, after the Court had begun to hear witness testimony regarding this issue, did Defendant finally admit that it had failed to do so.

The Court already has taken measures, however, to address Defendant's failure to search for and timely to produce relevant documents.  The Court appointed Mr. Ghourdjian (at Defendant's expense) to perform a thorough search and analysis of Defendant's electronic information.  All potentially-relevant documents were produced to Plaintiff.  Trial was continued for roughly nine months in order to allow Mr. Ghourdjian to complete his analysis, and to allow Plaintiff to review the documents produced by Mr. Ghourdjian.

According to Defendant, Mr. Ghourdjian's invoices totaled $168,045. (Opposition, at 13). The Court finds that this is an adequate sanction for Defendant's failure timely to produce relevant documents.

### 2. Spoliation

With respect to spoliation, the Court finds that Defendant failed to implement an adequate litigation hold notice in connection with this litigation. Plaintiff's complaint was filed on September 17, 2010. Defendant failed to distribute a written hold notice until March 3, 2011 – nearly six months later. Moreover, this notice was distributed to only three employees – Charles La Barbera, Howard Harper, and Dennis Jackson, (Dkt. 206, Exh. D) – and there is no evidence that Defendant took *any* steps to ensure that its employees actually complied with the notice. To the extent that Adrienne Rolla testified she *orally* informed certain employees of the need to preserve documents prior to the distribution of the written hold notice, such measures were insufficient to satisfy Defendant's obligation to preserve relevant documents.

However, while there is some evidence that spoliation of relevant evidence actually occurred, such evidence is minimal. Howard Harper testified in his deposition that he had deleted certain emails relating to Requests For Quotes ("RFQs") in connection with Roval products. (Harper Depo., at 133:7-134:1). Although these documents fell within the scope of documents requested by Plaintiff, Harper mistakenly believed that they were not relevant to this litigation. (See id.).

Other than Harper's deposition testimony, however, there is no direct evidence of any spoliation of relevant evidence. Pursuant to

the Court's November 22, 2011 Order, Defendant produced to Mr. Ghourdjian monthly backup tapes for its Exchange server (containing email documents) dating back to January 2010, and backup tapes for its file server (containing other electronic documents) dating back to August 2010.  Thus, Mr. Ghourdjian was provided with at least one "snapshot" of the contents of each of Defendant's servers *prior to* the filing of the instant complaint on September 17, 2010.  In his expert report, Mr. Ghourdjian noted that Defendant's monthly backup procedure "is not an uncommon practice as it provides a simple, cost-effective backup solution."  (Ghourdjian Final Report, at 4).

Plaintiff contends that if Defendant had taken steps to preserve documents immediately upon the filing of the complaint, *additional* backup tapes would have been available.  This contention is directly contrary to the unrefuted testimony of Adrienne Rolla that:

1.  In December 2009, Defendant discovered that its Exchange server backup tapes were corrupted; thus, as of the September 17, 2010 filing of the complaint, Defendant's Exchange server backup tapes went back only to January 2010; all of these tapes were produced to Mr. Ghourdjian, (Dkt. 304, Rolla Decl., ¶ 4), and

2.  in August 2010, Plaintiff installed a new file server backup tape system, at which point Plaintiff discarded all of the old backup tapes, which were incompatible with the new system; thus, as of the September 17, 2010 filing of the complaint, Defendant's file server backup tapes went back only to August 2010; all of these tapes were produced to Mr. Ghourdjian, (id. at ¶ 5).

Plaintiff correctly points out that because Defendant backs up its files only once per month, an email that was created, *e.g.*, on the 10th of the month and deleted on the 20th of the month would never show up on a monthly backup. (See Ghourdjian Final Report, at 5). Thus, it is *possible* that Defendant's employees deleted relevant emails, which were never preserved in a monthly backup tape. Notably, however, Defendant's servers were not configured *automatically* to delete emails after a certain period of time. Instead, users were *permitted* to delete emails on an individual basis. Cf., e.g., Surowiec v. Capital Title Agency, Inc., 790 F. Supp. 2d 997, 1008 (D. Ariz. 2011) (holding an adverse jury instruction was appropriate where:

> Capital routinely deleted electronic records pursuant to its 30-day retention policy. Although Capital asserts that it began preserving all emails as a matter of course in October of 2007, its failure to stop email destruction in April of 2007 resulted in the loss of emails between March and September of 2007, not to mention older emails on Romley's computer. The year 2007 was a period of intense communication and negotiation concerning the Shamrock Glen problem, and the Court has no doubt that preserving emails exchanged in March through September of that year would have provided valuable information to Plaintiff. Similarly, acting in April of 2007 to preserve the older emails then on Romley's computer surely would have preserved valuable evidence for Plaintiff. One example is the February 1, 2007 email that managed to survive and provided very helpful evidence to Plaintiff.).

### 3. Appropriate Sanction

Plaintiff requests the following sanctions, listed in order of preference: (1) default judgment; (2) adverse inferences with respect to functionality, secondary meaning, and likelihood of confusion; and (3) monetary sanctions.

> When considering a default sanction in response to spoliation of evidence, the court must determine (1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, [and] (4) the

relationship or nexus between the misconduct drawing the [default] sanction and the matters in controversy in the case.  In addition, the court may consider the prejudice to the moving party as an optional consideration where appropriate.  This multi-factor test is not a mechanical means of determining what discovery sanction is just, but rather a way for a district judge to think about what to do.

UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc. Copyright Litig.), 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) (quoting Halaco Eng'g Co. v. Costle, 843 F.2d 376, 380 (9th Cir. 1988)); Valley Engineers, Inc. v. Electric Eng'g Co., 158 F.3d 1051, 1057 (9th Cir. 1998)) (internal citations and quotation marks omitted).

Default judgment clearly is inappropriate in this case. Plaintiff's conduct with respect to discovery amounted to gross negligence, but it did not rise to the level of culpability sufficient to warrant default judgment under these circumstances.  Cf. Leon v. IDX Sys. Corp., 464 F.3d 951, 961 (9th Cir. 2006) (affirming default judgment where the defendant admitted he had intentionally deleted information from his company-issued laptop and had written a program to "wipe" any deleted files from the computer's hard drive, noting the district court's "bad-faith determination, ***which is a prerequisite to dismissing a case pursuant to a court's inherent power*** . . . was not clearly erroneous") (emphasis added).

Moreover, there is no "nexus" between Defendant's misconduct and the matters in controversy in this case.  As evidenced by the Court's analysis of the merits (discussed below), the key issues in this case – functionality, secondary meaning, and likelihood of confusion – are largely objective, externally-focused inquiries.  While technically "relevant" under the broad scope of Rule 26, the RFQs deleted by Harper would not have materially altered the Court's analysis in any way.

Similarly, the Court would not expect any documents that *may* have been destroyed due to Defendant's inadequate document preservation efforts to be probative of the substantive issues in this case.  This conclusion is bolstered by the Court's review of the documents that were (belatedly) produced by Defendant in this case, which do not materially advance Plaintiff's claims.  Cf. Surowiec, 790 F. Supp. 2d at 1008 (noting destroyed emails "surely would have [included] valuable evidence for Plaintiff.  One example is the February 1, 2007 email that managed to survive and provided very helpful evidence to Plaintiff.").

For similar reasons, the Court finds that the adverse inferences requested by Plaintiff are not an appropriate sanction.  "[A]lthough [adverse inference] instructions are less harsh than so-called terminating sanctions, they are properly viewed as among the most severe sanctions a court can administer."  Rimkus Consulting Group, Inc. v. Cammarata, 688 F. Supp. 2d 598, 619 (S.D. Tex. 2010).  Instead, the Court finds that monetary sanctions will "adequately mitigate the prejudice" suffered by Plaintiff.  See Apple Inc., 2012 U.S. Dist. LEXIS 103958 at *64.

Defendant's failure to comply with its discovery obligations in this case has resulted in a significant burden on both Plaintiff and this Court.  Accordingly, the Court finds that further monetary sanctions, in addition to the $168,045 in fees owed to Mr. Ghourdjian, are warranted.  In particular, Defendant shall reimburse Plaintiff for all reasonable costs and attorney fees incurred in connection with the following:

- any discovery-related motions filed with the magistrate judge in this action;

- preparation for, and appearance at, the third day of trial on October 27, 2012;

- Plaintiff's Motion *in Limine* No. 6 (including supplemental briefing and argument);

- communication with Mr. Ghourdjian regarding his review and production of Defendant's electronic documents; and

- Defendant's motions for judgment on partial findings, (see Dkt. 275, 279, 281, 282, 284), which were ill-conceived, inconsistent with the Court-ordered pretrial process (in light of the appointment of Mr. Ghourdjian), and largely inconsistent with the parties' related stipulation, (see Dkt. 257).

Within fourteen (14) days of the date of this Order, Plaintiff shall submit a request for costs and attorney fees in accordance with this Order, including appropriate evidentiary support for the amount requested.  Plaintiff may file an objection to this request no later than seven (7) days later.  The matter is set for hearing on September 17, 2012, at 1:30 p.m.

**IV.  MERITS OF PLAINTIFF'S CLAIMS**

In order to succeed on its claims of trademark and trade dress infringement, Plaintiff must establish that the asserted trademark and trade dress are:  (1) non-functional; (2) either inherently distinctive or have acquired secondary meaning; and (3) likely to be confused with Defendant's products by members of the consuming public.  International Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 823 (9th Cir. 1993).  The Court will address each element in turn.

12

**A.     Functionality**

**1.     Legal Standard**

A trademark is functional "when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 33 (2001).  To determine whether a product feature is functional, the Ninth Circuit considers four factors:  (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture.  Disc Golf Ass'n v. Champion Discs, Inc., 158 F.3d 1002, 1006 (9th Cir. 1998).  "No one factor is dispositive; all should be weighed collectively."

> A product feature need only have *some* utilitarian advantage to be considered functional.  *See International Jensen*, 4 F.3d at 823 (stating that the court should consider whether the design "yields *a* utilitarian advantage" (emphasis added)).  This court has never held, as DGA suggests, that the product feature must provide superior utilitarian advantages.  To the contrary, this court has suggested that "in order to establish nonfunctionality the party with the burden must demonstrate that the product feature serves *no purpose* other than identification." *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1531 (9th Cir. 1992) (internal quotation marks and citation omitted (emphasis added)).

Disc Golf, 158 F.3d at 1007-08.  Whether a purported trademark (or trade dress) is functional is a question of fact.  Id. at 1006 (citing Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1506 (9th Cir. 1987)).

**2.     Burden of Proof**

In the Ninth Circuit, the owner of a trademark generally bears the burden of demonstrating that the mark is nonfunctional.  Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1506 (9th Cir.1987); Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510, 1531 (9th Cir.1992).

Registration of a trademark under the Lanham Act, however, creates a
rebuttable presumption of trademark validity, including
nonfunctionality.  <u>Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.</u>,
644 F.2d 769, 775 (9th Cir. 1981).  The opposing party bears the burden
of overcoming this presumption by a preponderance of the evidence.  <u>Id</u>.
at 776.

   Here, Plaintiff's trademark in the Convex Arc design was
registered with the USPTO.  Accordingly, Defendant bears the burden of
demonstrating that the Convex Arc is functional.[3]  With respect to the
Unregistered Trade Dress, however, Plaintiff bears the burden of
demonstrating that it is nonfunctional.

### a.   The Convex Arc

   The Court will first evaluate the <u>Disc Golf</u> factors with respect
to Plaintiff's claimed trademark in the Convex Arc design.

### i.   Whether the Design Yields a Utilitarian Advantage

   According to Defendant's expert, Dr. Steven Schmid:

   [I]t is a fundamental principle that a curved surface confers
   a strength and stiffness advantage over a flat
   surface. . . .  Thus, loads applied toward the top of any
   mounted (or curved) object are better able to be withstood
   without excessive deformation than would be the case if the
   same loads or force were applied to a flat surface. . . .
   The use of the curved face means that the areas where curved
   faces have been used in the Contura products are stronger and

---

[3] Having been in continuous use for five consecutive years subsequent
to the date of its registration, Plaintiff's trademark in the Convex
Arc design has become "incontestable" under 15 U.S.C. § 1065.  This
term, however, is somewhat misleading.  An "incontestable" trademark
may be challenged on several grounds, including functionality.  <u>See</u>
J. Thomas McCarthy, <u>McCarthy on Trademarks</u> § 7:84 (4th ed. 2011)
(citing 15 U.S.C. § 1064); 15 U.S.C. § 1064 (a registered trademark
may be cancelled "[a]t any time if the registered mark . . . is
functional").

more durable than an otherwise identical product would be if a straight face were used in the same areas.

(Dkt. 158, Schmid Witness Decl., ¶ 5).  Plaintiff does not dispute this fundamental scientific principle.  In his deposition, for example, Plaintiff's industrial design expert, Cooper Woodring, testified as follows:

> Q.   What utilitarian function does the curved front face have?
> A.   Well, your experts have said it's stronger and stiffer. I don't disagree, at least under some circumstances.

(Dkt. 128-1, Thurston Decl., Exh. A, Woodring Depo., at 129:20-25).

> Q.   And in the second column of bullet points on the right, the second-to-last bullet point says:  "Curved design is more impact-resistant."  Do you see that?
> A.   I see that.
> Q.   And you agree with that statement, do you not?
> A.   It's more impact-resistant than the flat design.

(Woodring Depo., at 157:19 - 158:3).

Plaintiff points out that the Convex Arc does not *always* provide added strength and durability as compared to a flat surface, depending upon the size, shape and angle of the particular force being applied. This argument, however, misapprehends the analysis of functionality as stated by the Ninth Circuit:

> A product feature need only have **some** utilitarian advantage to be considered functional.  This court has never held, as [Plaintiff] suggests, that the product feature must provide superior utilitarian advantages.  To the contrary, this court has suggested that in order to establish nonfunctionality the party with the burden must demonstrate that the product feature serves **no purpose** other than identification.

Disc Golf, 158 F.3d at 1007-08 (internal citations and quotation marks omitted, emphases in original).

Thus, the mere fact that the Convex Arc does not provide superior strength in every conceivable scenario does not render it nonfunctional.  To the contrary, it is undisputed that the Convex Arc

15

provides "*some* utilitarian advantage." <u>See id</u>.  Accordingly, this factor weighs strongly in favor of a finding of functionality.[4]

### ii.  Whether Alternative Designs are Available

> If alternative designs can perform the same utilitarian design equally well, then exclusive use of only one of them will neither harm competition nor thwart the purposes of the utility patent system. . . .  A court must determine whether alternative means of performing the same function equally well are available in sufficient number that trademark protection for one of those means will not unduly impair competition.

J. Thomas McCarthy, <u>McCarthy on Trademarks</u> § 7:75 (4th ed. 2011). Here, Plaintiff contends that numerous alternative designs are available.  Plaintiff fails to explain, however, whether and how any such purported design alternatives "perform the same utilitarian design [as the Convex Arc] equally well."[5]  As discussed above, the Convex Arc provides superior strength and durability as compared to a flat-faced design.  Thus, alternative designs that do *not* provide this strength and durability advantage are largely irrelevant to the Court's analysis of this factor.

In light of the evidence in the record, the Court finds that the

---

[4] Plaintiff argues that its eighteen design patents, obtained for various Contura products, provide evidence of the nonfunctionality of its claimed trade dress.  None of these design patents, however, specifically claim the Convex Arc; they instead claim designs that incorporate the Convex Arc along with additional, purportedly nonfunctional ornamentation.  Having considered these design patents in light of all of the evidence in the record, the Court finds them minimally probative.  <u>See Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.</u>, 668 F.3d 677, 685 (9th Cir. 2012) ("While a design patent is some evidence of nonfunctionality, alone it is not sufficient without other evidence.") (quoting <u>McCarthy on Trademarks and Unfair Competition</u>, § 7.93 (4th ed. 2010)).

[5] (<u>See, e.g.</u>, Woodring Decl., at ¶ 26 (vaguely referring to numerous design patents for washroom accessories issued by the USPTO, with no further discussion)).

following relevant alternative designs are available:

  1. A front face that curves along the vertical axis (as opposed to the horizontal axis);

  2. A front face that curves along the vertical axis *and* the horizontal axis;[6] and

  3. A flat-faced design using stronger materials.

This minimal number of available alternative designs favors a finding of functionality.  See J. Thomas McCarthy, McCarthy on Trademarks § 7:75 (4th ed. 2011) ("The existence of seven hypothetical alternative designs has been characterized as still being a 'very limited number' of designs available to competitors which does not prevent a finding of functionality.") (quoting In re Lincoln Diagnostics, 30 U.S.P.Q.2d 1817, 1824 (T.T.A.B. 1994)); see also Switchmusic.com, Inc. v. U.S. Music Corp., 416 F. Supp. 2d 812, 821 (C.D. Cal. 2006) (granting summary judgment, holding:

> As evidence of the availability of alternative designs, Defendants submitted a catalog containing images of numerous guitars by various manufacturers.  Defendants claim that a visual review of this catalog demonstrates the wide variety of guitar body shapes and styles available in the marketplace.  Even when the Court views the record in the light most favorable to Defendants, there is insufficient evidence to support Defendants' claim.  On the contrary, the catalog shows that there are a limited number of shapes and styles available for guitars.  If Defendants were granted protection for their trade dress, it would have the undesired effect of severely hindering competition by reserving a particular design for Defendants' exclusive use.).

Here too, granting Plaintiff a monopoly on all washroom designs utilizing a front with a convex "arc" shape, as viewed from above,

---

[6] Given how broadly Plaintiff's purported trademark is phrased – covering any washroom product with a "front face having a convex 'arc' shape as viewed from above," this dual-curve design arguably would run afoul of Plaintiff's claimed trademark.  For purposes of this Order, however, the Court assumes that it would not.

would hinder competition.  Cf. Dogloo, Inc. v. Doskocil Mfg. Co., 893

F. Supp. 911, 915 (C.D. Cal. 1995) (concluding the "alternative

designs" factor weighed in favor of the nonfunctionality of Dogloo's

igloo-shaped dog shelter, where numerous alternative dome-shaped

designs were available, stating:

> Dogloo has submitted substantial evidence with regard to
> alternative designs which embody the same functional
> advantages as its igloo shape.  Mechanical engineer, Scott
> Meek testified that within the category of domed shelters, a
> large number of alternative designs are available.  He
> indicated that the igloo shape was not the exclusive medium
> for creating a "dome."  Meek drew 12 configurations which he
> claims have the same functional advantages as the igloo
> configuration. . . .  These configurations use a number of
> different combinations of curved, slanted, or straight edges
> or surfaces to create a domed shelter that does not mimic the
> igloo shape.  None of these alternative shelters resembles
> the igloo shape.) (emphasis added).

In Dogloo, the plaintiff claimed a fairly unique, igloo-shaped

trademark, and *specifically identified* twelve different alternative

designs, which embodied the same functional advantages as the igloo

shape without infringing the plaintiff's claimed trade dress.  Here, in

contrast, Plaintiff purports to claim trademark protection in a

broadly-defined Convex Arc design, and has specifically identified, at

most, three alternative designs.

Accordingly, this factor weighs in favor of a finding of

functionality.

### iii. Whether Advertising Touts the Utilitarian Advantages of the Design

#### (a) Plaintiff's Advertising

Plaintiff introduced its Contura line of washroom products, which

utilize the Convex Arc design, in 1993.  Beginning that year, Plaintiff

published a number of advertisements that emphasized the superior

functionality of the Contura products.  In several such advertisements, Plaintiff specifically touted the utilitarian advantages of the Convex Arc design.  One 1993 Contura marketing brochure stated the following:

> **Contura™ series product specifications.**
>
> **Arc and radius.**  Contura™ Series gives a new dimension to washroom accessories, featuring the same elegant, subtle degree of arc on the front of all accessories.  Units have uniform radius on all corners and edges of flanges, doors, waste receptacles, and cabinets.  ***And the distinctive arc and radius styling actually adds strength to door, waste receptacle and cabinet surfaces.***

(Exh. 55 (italicized emphasis added)).  Another 1993 Contura marketing brochure stated:

> **Renew washrooms and reduce maintenance costs.**
> • Features superior functional and operational benefits in response to building owner and maintenance contractor needs.
> • Lasting quality and durability; crafted of heavy-gauge stainless steel with seamless surfaces that are easier and faster to clean.
>    . . . .
> • ***Curved design is more impact-resistant. . . .***

(Exh. 59 (italicized emphasis added)).  Similarly, a 1995 advertisement stated that "Contura's subtle arcs and radiuses are as practical as they are beautiful and will provide years of service and lasting value."  (See Exh. 61).

Alan Gettelman, Bobrick's Director/Vice President of Marketing from 1990-2011, testified in his deposition that he reviewed the 1993 advertisements.  (Gettelman Depo., at 23:12 - 24:10).  With respect to the advertising claim that "the arc and radius styling actually adds strength to door, waste receptacle and cabinet surfaces," Mr. Gettelman testified that "[a]t the time that we prepared that copy, we felt that the statements were true," (id. at 51:24-52:17; see also id. at 57:10-14), "although that was never -- never tested," (id. at 56:12-13).  Mr.

Gettelman further testified that, at the time, he thought the Convex Arc affected the durability of the Contura products. (Gettelman Depo., at 57:25 – 58:6).

Plaintiff argues that it has not touted the functionality of the Convex Arc in its advertising for quite some time. According to Gettelman, "these claims were quickly removed and withdrawn by Bobrick when it determined that they were not supported by testing or independent evaluation." (Dkt. 150, Gettelman Decl., ¶ 64). The Court notes, however, that according to Gettelman, "Throughout 1993, Bobrick was issued approximately eighteen (18) design patents . . . . All of these design patents included the Convex Arc feature[.]" (Id. at ¶ 31). Similar to trademarks, design patents cannot be issued for functional designs. Thus, the fact that Plaintiff obtained numerous design patents in 1993 – the same year in which Plaintiff decided to remove references to the Convex Arc's functionality from its advertising – raises the obvious inference that Plaintiff changed its advertising, at least in part, in order to preserve its rights under the newly-issued design patents.

Adidas Am., Inc. v. Payless Shoesource, Inc., 546 F. Supp.2d 1029 (D. Or. 2008), cited by Plaintiff, is distinguishable. There, the court held that even if the flat sole of the adidas shoe was intended to be functional when it was introduced in 1969, subsequent improvements in shoe design had rendered the flat sole nonfunctional (and perhaps even detrimental to performance) by the relevant time period, which began in 2001:

> adidas has proffered evidence that the flat sole of the
> Original Superstar was considered optimal for a performance
> basketball shoe in 1969, when adidas introduced the Original
> Superstar, but that it is considered optimal no longer.

20

adidas has also introduced evidence that the rubber toe of
the Original Superstar shoe adds neither durability nor
performance to the shoes, but is purely ornamental and
actually increases the production cost.  Judge Stewart
concluded from this evidence that adidas had established the
nonfunctionality of the Original Superstar trade dress.  I
agree with that conclusion.

Id. at 1085 (quoting Adidas-Salomon Ag v. Target Corp., 228 F. Supp. 2d

1192, 1195 (D. Or. 2002)).

Here, in contrast, Plaintiff proffers no evidence that the Convex

Arc provides less strength and durability (as compared to flat-faced

designs) than it did in 1993.  Plaintiff states only that it removed

the "added strength" reference from its advertising because it had no

scientific or testing data to support the claim — not because this

claim was shown to be false by subsequent scientific developments, as

in Adidas.

**(b)  Defendant's Emails and Advertising**

At trial, Plaintiff emphasized that in emails and other documents,

Defendant's employees repeatedly stressed the importance of the

"aesthetic appeal" of the Convex Arc, as opposed to its functional

qualities.  (See, e.g., Exhs. 511, 512, 518, 529, 540, 541, 546, 552,

553).  To the extent these documents are relevant, they do not alter

the Court's conclusion; they simply confirm that the curved front face

provides both aesthetic and functional benefits, a fact that is

entirely consistent with a finding of functionality.  See, e.g., Disc

Golf, 158 F.3d at 1007-08 ("A product feature need only have **some**

utilitarian advantage to be considered functional. . . . [I]n order to

establish nonfunctionality the party with the burden must demonstrate

that the product feature serves **no purpose** other than identification.")

(internal citations and quotation marks omitted; emphases in original).

Plaintiff's product specification sheets tout both the functional and aesthetic benefits of the curved design.  (See, e.g., Exh. 228, at 1 ("Cabinet full door shall be drawn seamless and shall have bowed front face and gently radiused edges to provide added strength and complimentary appearance for modern washroom aesthetics.")).

\*\*\*

Accordingly, this factor weighs in favor of a finding of functionality.

### iv. Whether the Particular Design Results From a Comparatively Simple or Inexpensive Method of Manufacture

Based upon the evidence presented at trial, the Court finds that the Convex Arc is more expensive to manufacture than a flat-faced design.  The more difficult question is whether the increased cost of the Convex Arc is offset by its enhanced functionality (i.e., increased strength and durability).  While no "hard data" was presented with respect to this issue, it appears that the most cost-effective way to enhance strength is simply to use heavier-gauge steel.  Defendant, for example, recommends its Roval collection (which features a curved front face) for "prestige use," where "design/aesthetic [is] key" and there is "low/moderate traffic".  (Exh. 511-44).  Defendant recommends its Profile product line for "heavy traffic" areas, where the focus is "durability over design."  (Id.; see also Exh. 518-1 (noting the "Profile collection is really for high vandalism projects (it's the only one in the world in 1.5 mm thick stainless steel")).

Accordingly, this factor weighs in favor of a finding of nonfunctionality.

### v.   Conclusion

Viewed as a whole, the Disc Golf factors amply support a finding of functionality in this case.  As confirmed by both parties' experts, as well as Plaintiff's advertising surrounding the launch of its Contura product line, the Convex Arc provides utilitarian benefits in terms of both strength and durability.  See Disc Golf, 158 F.3d at 1007-08 ("A product feature need only have *some* utilitarian advantage to be considered functional.").  This enhanced strength and durability clearly affects the "quality" of the product.  See TrafFix Devices, Inc., 532 U.S. at 33 (A trademark is functional "when it affects the cost or quality of the device.").  While the Convex Arc is more expensive to manufacture than a flat-faced design, this fact does not, on its own, alter the Court's conclusion that the Convex Arc is functional.

### b.   Unregistered Trade Dress

As noted above, Plaintiff also claims trade dress protection in its Unregistered Trade Dress, which is comprised of the Convex Arc combined with the following five product features:  (1) cabinets and doors including rounded edges and corners which match one another, and which are curved to complement the Convex Arc; (2) recessed cabinet flanges including rounded edges and corners which are curved to complement the Convex Arc; (3) partially exposed flanges behind the doors; (4) partially exposed flanges behind the waste receptacles; and (5) outward-facing surfaces formed of #4 satin finish stainless steel.

The Court finds that Plaintiff has failed to meet its burden of demonstrating that the Unregistered Trade Dress is nonfunctional.  The Ninth Circuit's holding in Secalt S.A. v. Wuxi Shenxi Constr. Mach.

<u>Co.</u>, 668 F.3d 677 (9th Cir. 2012) is directly on point.  There, the plaintiff claimed trade dress protection in:

> 1) a cube-shaped gear box with horizontal fins; 2) a cylindrical motor mounted in an off-set position on the cube and partially overhanging the edge of the cube; 3) the cylindrical motor including vertical fins on a lower portion and a generally smooth sheet metal upper cover having a control descent lever and top cap positioned over the upper end and supported by rectangular legs; 4) a rectangular control box cantilevered to the motor by a square shaped member, the control box positioned over the cube, the control box including controls thereon; and 5) a rectangular frame.

<u>Id.</u> at 682.  The Ninth Circuit affirmed the district court's finding of functionality, reasoning:

> Tractel claims that the overall exterior appearance of its hoist is nonfunctional because the hoist's design — wherein the component parts meet each other at right angles — demonstrates a "cubist" look and feel.  Its engineering manager testified that the hoist's "cube shape was part of the design look" and that the fins were supposed to be "modern" and "flashy."  Tractel touts the "singular exterior design" that sets its hoist apart from those of its competitors by presenting evidence that its hoist has "more square edges" and a "rectangular look."  Tractel's fundamental misunderstanding — which infects its entire argument — is that the presumption of functionality can be overcome on the basis that its product is visually distinguishable from competing products.  While such distinctive appearance is necessary, it is here insufficient to warrant trade dress protection.
> . . . .
> Just as in [<u>Leatherman Tool Grp. v. Cooper Indus.</u>, 199 F.3d 1009 (9th Cir. 1999)], Tractel's hoist has an exterior appearance, as every object must; but there is no evidence that anything about the appearance exists for any nonfunctional purpose.  Rather, every part is de jure functional.  A piece of industrial machinery with "rectangular" components that meet each other at "right angles," without more, is wholly insufficient to warrant trade dress protection.  It is not enough to say that the design portrays a "cubist" feel — so does a square table supported by four legs.  The fins may be attractive but they serve a functional purpose.  And the cube-shaped gear box is simply housing.  Except for conclusory, self-serving statements, Tractel provides no other evidence of fanciful design or arbitrariness; instead, here, "the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to

say that there is still some sort of separate 'overall
appearance' which is nonfunctional."

Id. at 683-84 (quoting Leatherman, 199 F.3d at 1013).

Here, as in Secalt, there is nothing in Plaintiff's claimed design
that is fanciful or arbitrary.  Instead, "the whole [*i.e.*, Plaintiff's
claimed Unregistered Trade Dress] is nothing other than the assemblage
of functional parts[.]"  Id. at 683.  The "rounded edges" claimed by
Plaintiff are functional for the reasons discussed above in connection
with the Convex Arc.  The "flanges" function to hide the opening in the
wall into which the products are installed.  The stainless steel
finish, which is pervasive in the industry, is both easy to maintain
and durable.

* * *

Defendant has met its burden of demonstrating that the Convex Arc
is functional, and Plaintiff has failed to meet its burden of
demonstrating that the Unregistered Trade Dress is nonfunctional.
Accordingly, Plaintiff's claimed trademark and trade dress are invalid,
and Plaintiff's infringement claims fail as a matter of law.

**B.   Secondary Meaning**

With respect to the Unregistered Trade Dress, Plaintiff's
infringement claims also fail because Plaintiff has failed to
demonstrate that its purported trade dress has acquired secondary
meaning.[7]

---

[7] Were the Court to find that the Convex Arc is not functional,
Plaintiff's registration of the Convex Arc design (and five years of
subsequent continuous use) would create an incontestable presumption
that it had acquired secondary meaning.  See 15 U.S.C. § 1065.
Accordingly, lack of secondary meaning provides an alternative basis
for the Court's decision with respect to the Unregistered Trade Dress
only.

### 1.   Legal Standard

Secondary meaning is used generally to indicate that a mark
. . . has come through use to be uniquely associated with a
specific source.  To establish secondary meaning, [Plaintiff]
must show that, in the minds of the public, the primary
significance of a product feature or term is to identify the
source of the product rather than the product itself.

Quiksilver, 466 F.3d at 760 (quoting Two Pesos, Inc. v. Taco Cabana,

Inc., 505 U.S. 763, 766 n.4 (1992)).

Factors considered in determining whether a secondary meaning
has been achieved include:  (1) whether actual purchasers of
the product bearing the claimed trademark associate the
trademark with the producer, (2) the degree and manner of
advertising under the claimed trademark, (3) the length and
manner of use of the claimed trademark, and (4) whether use
of the claimed trademark has been exclusive.

Committee for Idaho's High Desert v. Yost, 92 F.3d 814, 822 (9th

Cir. 1996).  Survey evidence is considered "the most persuasive

evidence of secondary meaning," but there is no absolute requirement

that a survey be performed.  Id.

"Whether or not a trademark has acquired secondary meaning is a

question of fact."  Marker International v. De Bruler, 844 F.2d 763,

764 (10th Cir. 1988).  Plaintiff bears the burden of demonstrating

secondary meaning.  Secular Orgs. for Sobriety, Inc. v. Ullrich, 213

F.3d 1125, 1130 (9th Cir. 2000).

### 2.   Discussion

#### a.   Intentional Copying

Plaintiff's primary argument with respect to secondary meaning is

that Defendant deliberately copied the design of Plaintiff's Contura

products, which supports a finding that Plaintiff's Unregistered Trade

Dress has acquired secondary meaning.  See Vision Sports, Inc. v.

Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989) ("[W]e have held that

proof of copying strongly supports an inference of secondary

meaning."). This inference, however, is based upon the presumed intent of the copier to deceive consumers as to the source of the product in question. "When a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied." Osem Food Industries, Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 165 (4th Cir. 1990). Accordingly, this inference loses its evidentiary value where a newcomer copies a competitor's product configuration for reasons other than deceiving consumers as to the product's source.

First, the mere copying of product configurations does not suggest that the copier was necessarily trying to capitalize on the good will of the source of the original product. See Duraco, 40 F.3d at 1453; see also infra at - (discussing implications of defendant's intent to copy). A presumption to the contrary would be mandated, if ever, only in the narrow class of cases where both (1) a product configuration is desirable to consumers primarily because of the configuration's inherent or acquired identification with the original source, and (2) the copier adopts affirmatively misleading labelling and/or marketing for the copied product, cf. Quaker Oats Co. v. General Mills, Inc., 134 F.2d 429, 432 (7th Cir. 1943) ("The pirate flies the flag of the one he would loot. The free and honorable non-pirate flies the colors of his own distinctive ensign.").

Second, although a product's trade dress in the form of its configuration could function as an indicator of the product's source, product configurations in general are not reliable as source indicators, for functional configurations are not protected and thus may be freely copied, see Duraco, 40 F.3d at 1441, 1448-49, 1451, and inherently distinctive configurations will be rare, see id. at 1446. Since substantially identical products are often sold by different manufacturers under different names, consumers are accustomed to relying on product packaging and trademarks to identify product sources.

Versa Prods. Co. v. Bifold Co., 50 F.3d 189, 201 (3d Cir. 1995).

Here, Defendant does not dispute that it copied the design of

Plaintiff's Contura series.  The evidence is overwhelming, however, that Defendant copied this design for its perceived *aesthetic value* in the eyes of consumers,[8] not in an attempt to deceive consumers as to the source of its goods.  (<u>See, e.g.,</u> Exhs. 511, 512, 518, 529, 540, 541, 546, 552, 553).  Defendant's "ASI" logo is displayed on each of its products, and all of its products are shipped in boxes that prominently display the company's name.  <u>Cf. id.</u> (deliberate intent to copy a product configuration supports a finding a likelihood of confusion only where "the copier adopts affirmatively misleading labelling and/or marketing for the copied product").

Plaintiff argues that <u>Versa</u> is not the law in the Ninth Circuit. The Court disagrees.  First, <u>Versa</u> has been cited with approval by the Ninth Circuit for the very proposition relied upon here.

> *Versa Products Company, Inc. v. Bifold Co. (Manufacturing) Ltd.*, 50 F.3d 189, 207-08 (3d Cir. 1995) (holding that deliberate intent to copy does not support finding a likelihood of confusion in product configuration cases unless a "product's labeling and marketing are also affirmatively misleading").

<u>Leatherman Tool Group, Inc. v. Cooper Indus.</u>, 199 F.3d 1009, 1013 (9th Cir. 1999).  Moreover, the <u>Versa</u> decision is grounded firmly in logic and common sense.  Absent a desire to take advantage of the source-identifying aspects of a particular product configuration, the intentional copying that product configuration does not, as a matter of logic, support the inference that the configuration has acquired secondary meaning.

Accordingly, Defendant's copying of Plaintiff's Contura design does not support an inference of secondary meaning in this case.

---

[8] In addition to functional benefits.

b.   **Other Relevant Factors**

Plaintiff did not produce any survey evidence regarding secondary meaning in this case.  See Yost, 92 F.3d at 822 (holding survey evidence is "the most persuasive evidence of secondary meaning," but is not absolutely required).  Moreover, Plaintiff failed to produce *any* (persuasive) evidence that purchasers associate its Unregistered Trade Dress with a specific product source.  As discussed below, washroom accessories are purchased pursuant to detailed specifications, which include, *inter alia*, the name of the manufacturer requested by the purchaser.  If a purchaser likes a particular product, but is amenable to buying a comparable (and likely less expensive) substitute, he can specify "or equivalent" in the specification (*e.g.*, "Bobrick 12345 *or equivalent*").  Purchasers are, in effect, conditioned to expect that different manufacturers will have products that are virtually identical in appearance.  Accordingly, the Third Circuit's observation in Versa is particularly applicable in this case.

> Since substantially identical products are often sold by different manufacturers under different names, consumers are accustomed to relying on product packaging and trademarks [or, in this case, detailed specifications] to identify product sources.

Versa Prods. Co. v. Bifold Co., 50 F.3d 189, 201 (3d Cir. 1995).

Here, the overwhelming evidence is that purchasers view Plaintiff's purported trade dress strictly in reference to its functionality and aesthetic value — not as a source-identifier. Accordingly, Plaintiff's Unregistered Trade Dress cannot have acquired secondary meaning.  See Clicks Billiards, Inc. v. Sixshooters Inc., 251 F.3d 1252, 1262 (9th Cir. 2001) ("The elements making up the alleged trade dress must have been used in such a manner as to denote product

source.  Thus, a product feature whose only impact is decorative and
aesthetic, with no source-identifying role, cannot be given exclusive
rights under trade dress law.") (quoting 1 McCarthy § 8:1; Steven W.
Boney, Inc. v. Boney Servs., Inc., 127 F.3d 821, 828 (9th Cir. 1997)).

In light of the analysis above, the remaining factors – the degree
and manner of advertising under the claimed trademark; the length and
manner of use of the claimed trademark; and whether use of the claimed
trademark has been exclusive – are of little probative value in this
case.  See Yost, 92 F.3d at 822.  Plaintiff claims to have spent
roughly $2.6 million advertising its Contura line of products, but this
advertising was spread over a nearly twenty-year period.  Moreover,
none of this advertising supports the conclusion that the Unregistered
Trade Dress is source-identifying.  Instead, this advertising focused
on the aesthetic appeal of the Contura products and, as discussed
above, the functional benefits of the Convex Arc.  Similarly, while
Plaintiff was the exclusive provider of washroom products incorporating
the Convex Arc design for several years, there is simply no basis upon
which the Court can conclude that Plaintiff's Unregistered Trade Dress
acquired secondary meaning during that period.

                              * * *

Plaintiff has failed to meet its burden of demonstrating that its
Unregistered Trade Dress has acquired secondary meaning.  Accordingly,
Plaintiff cannot succeed on its claim that Plaintiff infringed this
Unregistered Trade Dress.

**C.   Likelihood of Confusion**

**1.   Legal Standard**

The "likelihood of confusion" inquiry generally considers
whether a reasonably prudent consumer in the marketplace is

likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case.

Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, *44 (9th Cir. 2012).  In conducting the "likelihood of confusion" analysis, courts in the Ninth Circuit evaluate eight factors that were first enumerated in the 1979 Sleekcraft opinion:

(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

Id. at *46 (citing AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979)).

It is well established that this multi-factor approach must be applied in a flexible fashion.  The Sleekcraft factors are intended to function as a proxy or substitute for consumer confusion, not a rote checklist.  In other words, we do not count beans.  A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances. . . . [E]vidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a "likelihood of confusion" finding.  [T]he result of the consideration of one factor can influence the consideration of another.  In the end, [t]his eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts.

Id. at *47 (internal citations and quotation marks omitted).

## 2.   Discussion

### a.   Evidence of Actual Confusion (Factor 4)

#### i.   Surveys

Defendant retained an expert, Dr. Michael Mazis, to conduct a consumer survey to determine whether distributors and architects who purchase commercial washroom products are likely to be confused as to

the source of Defendant's Roval products.  (See Dkt. 157).  Dr. Mazis found an extremely low likelihood of confusion: 7.4% for architects; 1.3% for distributors; and 4.7% for the combined sample.  (Id.). Plaintiff also retained an expert, Dr. Sandra Cogan, who performed a "likelihood of confusion" survey of architects.  (See Dkt. 146).  Dr. Cogan found a significantly higher "net confusion" of 38.46%.  (Id.).

The Court finds that Dr. Cogan's survey is entitled to no probative weight and is, in fact, inadmissible under Federal Rule of Evidence 702.  Dr. Cogan used the so-called *Squirt* methodology in conducting her survey.  Participants were sent two envelopes.  They were instructed to open the first envelope, which contained an advertisement for one of Plaintiff's products.  They were then instructed to put this advertisement back into the first envelope and to open the second envelope, which contained advertisements for four other products:  one manufactured by Plaintiff, and three manufactured by other companies (*i.e.*, the "control group").  Participants were then asked a series of questions regarding the relationship of the products in the second envelope to the company that manufactured the product in the first envelope.

The advertisements used in Dr. Cogan's survey, however, were extremely leading.  The advertisements for Plaintiff's product and Defendant's product were nearly identical:  similar products, arranged in a similar fashion (*i.e.*, a full-page photograph of the product arranged vertically on the page), with similar shading, style and other visual characteristics.  The advertisements for the other three products – the purported "control group" – were substantially different.  Instead of a full-page photograph of the relevant product,

each of these advertisements contained a very small photograph.   One
advertisement (for Kimberly-Clark) showed a different product
altogether.   Another advertisement (for Bradley) was oriented
horizontally, instead of vertically (as were all of the other
advertisements).   The "control group" advertisements also differed from
Plaintiff's and Defendant's advertisements in terms of shading, style,
and other visual characteristics.

     In sum, Dr. Cogan's survey format effectively predetermined its
result – participants inevitably would conclude there was a
relationship between the substantially-similar advertisements for
Plaintiff's and Defendant's products, as opposed to the substantially-
different advertisements for the remaining three manufacturers.
Accordingly, the survey is neither admissible nor entitled to any
probative weight.   See, e.g., Mattel, Inc. v. MCA Records, Inc., 28 F.
Supp. 2d 1120, 1135 (C.D. Cal. 1998) ("A survey question which begs its
answer cannot be a true indicator of the likelihood of consumer
confusion.") (quoting Universal City Studios, Inc. v. Nintendo Co., 746
F.2d 112 (2d Cir. 1984)).

     In contrast, the Court finds Dr. Mazis' survey both admissible and
persuasive.   Dr. Mazis utilized the so-called *Eveready* methodology in
conducting his survey.   Participants were instructed to look at an
advertisement for one of Plaintiff's products for the same amount of
time that they would look at it if they saw it in a magazine.
Participants were then asked a series of questions regarding the source
of the product shown in the advertisement.   The survey was not leading,
and it consistently showed a very low likelihood of confusion.

### ii.  Actual Confusion

Plaintiff argues that it has produced direct evidence of actual confusion among consumers.  None of the evidence cited by Plaintiff, however, supports this contention.  In an October 23, 2009 email, for example, a distributor wrote:  "I just saw the catalog on the new ASI Contura, I mean Roval, accessories.  They look nice and the removable waste can is a Huge selling point."  (Exh. 539).  In context, the reference to "Contura, I mean Roval" is clearly a joking acknowledgment of the similarity in appearance between the Contura and Roval product lines.  Plaintiff's contention that the writer of this email was actually confused as to the source of the Roval products simply is not a reasonable inference, and even if it is a *possible* inference, it is not one that this Court accepts.

Citing Exhibit 507, Plaintiff contends that Defendant's refusal to write a "generic equivalency letter" provides evidence of likely consumer confusion.  To the contrary, Exhibit 507's reference to side-by-side comparisons of Plaintiff's and Defendant's products (which are provided both to distributors and to their customers) provides further evidence that consumers are *not* likely to be confused as to the source of Defendant's products.

> Please be advised that we are not going to write a generic equivalency letter for these competitive product lines [*i.e.*, Defendant's Roval product line versus Plaintiff's Contura product line].  ***We have already furnished several pages of side-by-side feature comparison sheets for you and/or your customers to determine the relative merits of either product line.***
>
> We feel the Roval™ product line stands above the competition in delivering better value in quality, features, finish, options, offered products, construction and cost of ownership.

(Exh. 507 (emphasis added)).

With respect to Exhibit 595, the mere fact that a distributor returned a product to Defendant using a Bobrick box is not indicative of consumer confusion.  The logical inference is simply that the distributor returned the product to Defendant using whatever empty box was available.  Dennis Jackson testified that it is not uncommon for Defendant to receive returned items in boxes different than those in which the items originally were shipped.

Exhibit 601, also relied upon by Plaintiff, amounts to nothing more than an email complaint regarding the quality of Defendant's products.  The operative specification apparently listed "Bobrick B-39617" as the "Basis-of-Design Product," but also listed Defendant as an acceptable manufacturer.  Defendant's towel dispenser was ultimately approved, (id. at 6), but after experiencing difficulties operating the dispenser, the purchaser concluded "these thing[s] are a piece of crap," (id. at 7).  As demonstrated by the approved specification, the issue was not that the purchaser was confused as to the source of the product.  Instead, the purchaser was simply angry at the perceived low quality of the product.

Plaintiff also relies on Exhibit 589, a March 3, 2011 email that states, *inter alia*:

> Roval is beginning to gain in popularity with distribution. Several distributors have asked that ASI not be stamped on the accessories so they can submit Bobrick Contura but supply Roval.  We don't encourage that idea but, it could easily be done if there were no stamps.

In light of the highly-sophisticated purchasing process in the washroom accessories industry (discussed below), this email simply confirms that without removing the ASI logo from its products, neither Defendant nor its distributors are able to deceive the purchasers of its products as

to the products' source.  It is undisputed that Defendant has *not*
removed the "ASI" stamp from its products.

In sum, Plaintiff has produced no probative evidence of actual
consumer confusion.

> **b.   Marketing Channels (Factor 5) and Degree of Care
> Likely to be Exercised by Purchaser (Factor 6)**

Plaintiff and Defendant operate in a highly sophisticated,
structured industry.  The purchase of washroom accessories typically
proceeds as follows.  An architect, who works for a building owner,
prepares detailed "specifications" for, among other things, washroom
accessories.  The specifications may identify several acceptable brands
for a given product, specify a single acceptable brand, or specify that
a preferred brand "or equivalent" be used.  Thus, for example, if a
Bobrick Contura product "or equivalent" is specified, a sufficiently
similar ASI Roval product could be used in accordance with the
specification.

Once the architect's designs are completed, the owner of the
building accepts bids from contractors, to whom the architect's designs
(and specifications) are given.  The chosen contractor, in turn,
typically will coordinate with subcontractors (also referred to as
distributors) to work on different parts of the building.  Based on the
operative specifications, the distributors will then solicit quotes
from manufacturers such as Bobrick and ASI.  After choosing their
preferred vendor(s), the distributors will submit their plans to the
architect (through the contractor) for approval.  Once the architect
approves these plans, orders are placed and products are shipped.  (See
generally Jackson Decl., at ¶¶ 4-11).  Thus, any product substitution

by a distributor must:  (1) be permissible under the applicable

specification (*i.e.*, through the use of "or equivalent"); and

(2) subsequently be approved by the architect.

Moreover, in light of the evidence produced at trial, the Court

finds that the relevant purchasers of washroom accessories are highly

sophisticated, and, therefore, are likely to exercise a high degree of

care.  See J. Thomas McCarthy, McCarthy on Trademarks § 23:102 & n.26

(4th ed. 2011) ("a higher degree of care [is] exercised by

'professional buyers' purchasing . . . building supplies selected by

architects") (collecting cases); accord K-S-H Plastics, Inc. v.

Carolite, Inc., 408 F.2d 54, 56-57 (9th Cir. 1969).  Plaintiff's

expert, Dr. Cogan, conceded during her testimony that the parties

operate in a "very sophisticated market," and that it is "pretty tough

to fool them."

Accordingly, in light of the unique, highly-structured nature of

the industry, and the sophisticated nature of the relevant purchasers,

the Court finds that there is virtually no possibility of consumer

confusion.

> Although no one factor is dispositive of the "likelihood of
> confusion" inquiry, the sophistication and expertise of the
> usual purchasers can preclude any likelihood of confusion
> among them stemming from the similarity of trade names. . . .
> The district judge below erred because he made no inquiry
> into the sophistication of the ordinary consumer of
> construction services -- most likely a highly trained
> procurement professional whose sensitivity is heightened by
> the responsibility of sensibly spending millions of dollars.

Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., 963 F.2d 628, 637

(3d Cir. Pa. 1992) (quoting Perini Corp. v. Perini Construction, Inc.,

915 F.2d 121 (4th Cir. 1990)) (vacating district court's order entering

preliminary injunction against defendant based, in part, on the court's

failure to take into account the sophistication of the relevant purchasers).

The Court notes that throughout this litigation, Plaintiff has not been consistent with respect to who qualifies as the relevant "consumer(s)" for purposes of the "likelihood of consumer confusion" analysis. Plaintiff's expert surveyed architects. At trial, however, Plaintiff stressed the possibility that building owners, who ultimately pay for washroom accessories, could be confused. In any event, the vast majority of purchases are made in consultation with architects, contractors, and/or distributors, all of whom are undoubtedly highly sophisticated purchasers.

Moreover, in the rare case where a building owner decides to purchase washroom accessories without the assistance of an architect or other professional, the logical inference is that such a building owner – a businessperson successful enough to own at least one commercial building, and confident enough to purchase building-related equipment on his or her own – also would exercise a high degree of care in making these purchases. Plaintiff speculates to the contrary, *i.e.*, that building owners would exercise a low degree of care in purchasing washroom accessories, but has produced no evidence to support this contention.[9]

---

[9] In addition to consumer confusion, Plaintiff vaguely contends in its Trial Brief that there is a likelihood of "post-sale" confusion in this case. (See Dkt. 292, at 4 ("Post-sale confusion thus recognizes that ASI's alleged infringement could damage Bobrick where 'consumers can acquire the prestige value of [Bobrick's] product by buying the copier's cheaper imitation.") (quoting Gucci Timepieces Am. Inc. V. Yidah Watch Co., No. CV-97-6985-KMW (MANx), 1998 WL 650078, at *6 (C.D. Cal. 1998))). Plaintiff has produced no probative evidence, however, to support this theory of liability.

### d.   Remaining Factors

The remaining <u>Sleekcraft</u> factors do not materially affect the Court's analysis in this case.   For the reasons discussed above, Plaintiff has no valid trade dress rights in either the Convex Arc or the Unregistered Trade Dress; at best, the strength of any such purported trade dress would be weak, (Factor 1).   Plaintiff and Defendant undoubtedly sell similar goods, (Factor 2), with a similar appearance, (Factor 3), but as discussed above, the nature of the washroom accessories industry virtually forecloses a likelihood of consumer confusion.   Moreover, given the sophisticated nature of the relevant purchasers, the fact that Defendant stamps its "ASI" logo on all of its products further reduces the possibility of confusion. Defendant's intent in selecting the product configuration at issue, (Factor 7) – *i.e.*, to take advantage of its functional and aesthetic characteristics – weighs against a finding of a likelihood of confusion.   Finally, the likelihood of expansion of the parties' product lines, (Factor 8), is irrelevant in this case.

*   *   *

Plaintiff has failed to demonstrate a likelihood of confusion with respect to either the Convex Arc or the Unregistered Trade Dress. Accordingly, Plaintiff's infringement claims fail on this alternative basis as well.

### D.   Additional Claims

For the reasons set forth above, Plaintiff failed to establish its claims for trademark infringement and false designation of origin under the Lanham Act.   Plaintiff's remaining state law claims, which are predicated upon the same alleged acts of infringement, fail for the

same reasons.

**IV.   CONCLUSION**

For the reasons set forth above, the Court finds Defendant NOT LIABLE on all claims.

Unless they are specifically addressed in this Order, all pending motions are DENIED AS MOOT.


IT IS SO ORDERED.


DATED:   August 8, 2012

_____

**STEPHEN V. WILSON**

**UNITED STATES DISTRICT JUDGE**